**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| RAMONA L. SMITH, Individually, and As The Temporary Administrator of the Estate of her deceased husband, Arthur Melton Smith, Tara Cheyenne Smith, Ramona Allen, and Glenda Zimmer | § § § § § § | |
| Plaintiffs, | § § | **JURY DEMAND** |
| v. | § § § | **CAUSE NO.: 1:15-CV-0218** |
| Chrysler Group, LLC a/k/a FCA US LLC, and GEICO CASUALTY COMPANY a/k/a GOVERNMENT EMPLOYEE INSURANCE COMPANY | § § § § § | |
| Defendants | | |

**PLAINTIFFS' RESPONSE TO DEFENDANT, FCA US LLC'S MOTION TO STRIKE THE EXPERT TESTIMONY OF GARY D. KRONRAD, PH.D. REGARDING MENTAL ANGUISH DAMAGES, LOSS OF COMPANIONSHIP AND SOCIETY, AND LOSS OF HOUSEHOLD SERVICES**

**COMES NOW**, Plaintiffs, Ramona Smith, Individually, and As The Temporary Administrator of the Estate of her deceased husband, Arthur Melton Smith, Tara Cheyenne Smith, Ramona Allen, and Glenda Zimmer, by counsel, respectfully moves the Court to deny Defendant, FCA US LLC's Motion to Strike Expert Testimony of Gary D. Kronrad, Ph.D., regarding Mental Anguish Damages, Loss of Companionship and Society, and Loss of Household Services due to the fact that Gary D. Kronrad has testified about specific issues asserted by Plaintiffs herein before the Court and he is a qualified expert who has based his opinions on reliable data and such opinions are not unreliable nor speculative.

## I.     BACKGROUND

This case arises out of Defendant FCA's design, manufacture, and sale of a defective and unreasonably dangerous 2013 Jeep Wrangler Automobile (the "Jeep"), which FCA eventually recalled admitting that a fluid leak within the engine compartment of the Jeep could occur because of a design defect, and that once released, that fluid could create an underbody fire and result in a crash.  Although FCA knew of this defect and the dangers it posed, it sold the Smiths the Jeep without any warning about that defect or the dangers to which they would be subjected.

Fully consistent with this "Recall Failure Mode," Mr. Smith was traveling in the Jeep when an under body fire occurred that lead to a crash.  Although he was wearing his seatbelt, Mr. Smith died instantly when the Jeep struck a concrete bridge pillar.  Only a few days after Mr. Smith's fatal crash, FCA finally gave the Smiths' notice of the defects and dangers posed by the Jeep.

After the crash, Mrs. Smith contacted her auto insurer, GEICO, which took possession of the remains of the Jeep.  Although GEICO contracted with Mrs. Smith to store and preserve the remains of the Jeep, it sold those remains for their meager scrap value without any notice to Mrs. Smith in an utter bad-faith breach of their contract.

Although Defendant FCA has repeatedly represented to this Court that it was unaware of this incident until after GEICO sold the Jeep for scrap, in fact, Defendant FCA was contacted by Mrs. Smith and put on notice of the crash nearly 7 months before the Jeep was destroyed.  Mrs. Smith called Defendant FCA and advised FCA that her husband had been killed in a recalled Jeep and requested information about the vehicle's black box, its owner's manual, and its warranty because those documents had been consumed by the fire in the crash.  Defendant FCA delivered the requested documents to Mrs. Smith at her home address in Shelbyville, Texas where FCA had earlier sent its recall notice.  Despite its recall of the Jeep, Defendant FCA, however, never

requested an opportunity to inspect that vehicle and took no action whatsoever to preserve that vehicle.

Defendant FCA alleges that the defective and unreasonably dangerous nature of the Jeep and its crash in the very manner described in its recall notice played no role in Mr. Smith's death. Rather, FCA claims that Mr. Smith committed suicide by intentionally running the Jeep into the concrete bridge pillar. FCA's theory, however, could not possibly be accurate, due to Mr. Smith's autopsy.

At Mr. Smith's autopsy, Dr. John A. Stash, the medical examiner who performed the autopsy, discovered that Mr. Smith had an 18% carbon monoxide saturation level in his blood. Dr. Stash testified that 18% was nearly double the expected saturation for a regular smoker. Further, Defendant's own expert's report found that "heavy smokers" can reach levels up to 15% of carbon monoxide saturation. Yet, all of the evidence in this case indicates that Mr. Smith smoked about one pack of cigarettes per day, which is not the definition of a heavy smoker.

Moreover, because Mr. Smith died upon impact, there is no way that he inhaled carbon monoxide from the resulting fire from the car crashing into the pillar. Therefore, the only way he could have absorbed such an elevated level of carbon monoxide would be from a fire burning within the Jeep before it ever struck the concrete bridge pillar. It is undisputed that carbon monoxide saturation levels of the magnitude found during Mr. Smith's autopsy can cause significant impairment and difficulties with complex tasks like driving an automobile.

In addition, because Mr. Smith had previously had cardiac stents implanted, he was even more susceptible to the deleterious effects of carbon monoxide. Thus, FCA's oft-repeated argument that Mr. Smith must have committed suicide because he did not exhibit the kind of response to an underbody fire that FCA would expect, is easily dispelled by the irrefutable

scientific evidence that Mr. Smith was subjected to carbon monoxide from an onboard fire in the Jeep before it ever struck the concrete pillar proving that the "Recall Failure Mode" caused his death.

Plaintiffs have plead for damages

   a. the loss of Mr. Smith's earning capacity, the value of the care, maintenance, services, support, advice and counsel that he would have provided to his family;
   b. the Plaintiffs' mental anguish, including their emotional pain, torment, and suffering over the wrongful death of Mr. Smith;
   c. Plaintiffs' loss of the positive benefits of Mr. Smith's love, comfort, companionship and society; and
   d. loss of inheritance from Mr. Smith.

2. Pursuant to Tex. Civ. Proc. & Rem. Code § 71(A), Defendant Chrysler is liable for Mr. Smith's wrongful death based on Defendant Chrysler's wrongful acts, neglect, carelessness, and the defective and unreasonably dangerous nature of the Subject Vehicle, as set forth herein, including for the following:

   a. the loss of Mr. Smith's earning capacity, the value of the care, maintenance, services, support, advice and counsel that he would have provided to his family;
   b. the Plaintiffs' mental anguish, including their emotional pain, torment, and suffering over the wrongful death of Mr. Smith;
   c. plaintiffs' loss of the positive benefits of Mr. Smith's love, comfort, companionship and society; and
   d. loss of inheritance from Mr. Smith.

## II.     THE *DAUBERT* STANDARD

In *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, the United States Supreme Court clarified Federal Rule of Evidence 702 as requiring a gate-keeper function on trial courts to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. 579, 592-93 (1993). The Fifth Circuit has clarified this to mean that expert testimony is only admissible if its both "relevant" and "reliable." *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 589).

"A party seeking to introduce expert testimony must show (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (internal quotation and citation removed). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (citation omitted).

Whether an expert is qualified to provide testimony on specific issues is a preliminary question to be determined by this Court. *Newton v. Roche Labs., Inc.,* 243 F. Supp. 2d 672 (W.D. Tex. 2002); *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713 718 (Tex. 1998). Trial courts must ensure those who claim to be expert truly have expertise concerning the actual subject about which they are offering an opinion. *See Kumho Tire Co Ltd.,* 119 S. Ct. at 1175-1176; *Gammill,* 972 S.W.2d at 719. The party offering the expert's testimony must prove that the witness

is qualified. *Mathis v. Exxon Corp.,* 302 F.3d 448, 459-460 (5th Cir. 2002); *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex. 1998).

Expert testimony is admissible only if "the expert's testimony is . . . based upon a reliable foundation." *Robinson*, 923 S.W.2d at 568; *see also Daubert,* 509 U.S. at 589. Federal law divides reliability into at least two components: (1) whether the underlying foundation of the evidence is reliable, and (2) whether the evidence itself is proven to be reliable. *See Robinson,* 923 S.W.2d at 556; *Havner,* 953 S.W.2d at 714; *see also Daubert,* 509 U.S. at 590, n.9. If either one is lacking, then the testimony fails to assist the trier of fact to understand the evidence or determine a fact in issue." *See Daubert,* 509 U.S. at 591; *Robinson*, 923 S.W.2d at 549. Even if the underlying data are sound, expert testimony is unreliable if the expert draws conclusions from that data based on flawed methodology. *Id.* Moreover, the trial court must exclude expert testimony if there is to great an analytical gap between the data and the opinion proffered. *Gammill v. Jack Williams Chevrolet, Inc.* 972 S.W.2d 713, 727 (Tex. 1998).

### III.  RESPONSE TO MOTION TO STRIKE

A.  The Methodology is Reliable

Kronrad's methodology and testimony on non-pecuniary damages is to provide the jury with a methodology to be able to determine a per day basis for mental anguish damages, loss of companionship and society, and loss of household services based on Plaintiff's life expectancy. The calculated methodology provided by Dr. Kronrad is not a time unit calculation but is a means by which the jury could calculate damages based on the injury sustained by the Plaintiffs for mental anguish damages, loss of companionship and society, and loss of household services. Dr. Kronrad testimony allows the jury to make the determination of whether the Plaintiffs should be awarded the damages and his methodology will help the jury to calculate and provide a sum total of such

damages to answer the questions on the Charge. Whether Dr. Kronrad assesses $10 or $100 per daily value is not the issue but clearly demonstrates the methodology to be employed by the jury which only the jury can determine for the damages plead.

B.  Methodology is Not Subject to Speculation

The methodology is not subject to speculation because it is based on the life expectancy of the Plaintiffs which is based on reliable data from the Nation Vital Statistics Reports; United States Life Tables released by the U.S. Department of Health and Human Services.

For each element of damages for mental anguish damages, loss of companionship and society, and loss of household services, the calculations are based on the Plaintiffs' life expectancy. The methodology of the calculations is determined by life expectancy for example (Ramona Smith Future Mental Anguish Damages is 18.5 years = 6,779 days x $10.00 per day = $67,797.00.) The 18.5 is the life expectancy of Arthur Smith which equates to 6,779 days. The variable is the amount the jury would attribute to the daily damages incurred for each type of damages. Each element of damages is ascertainable by the methodology provided by Dr. Kronrad. The methodology is not subject to speculations and the life expectancy tables are reliable statistics provided by the government for persons based on their age, race, nationality, and gender.

Ultimately, the opinions of Dr. Kronrad aid the jury in determining the basis of the calculations for awarding damages to Plaintiffs. The opinions are reliable and not subject to speculation. He has provided testimony based on economic data which has been analyzed and reviewed; government reports with validity and merit.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request that the Court deny Defendant, FCA US LLC's Motion to Strike Expert Testimony of Gary Kronrad Regarding Mental Anguish Damages, Loss of Companionship and Society and Loss of Household

Services for the reasons stated above and for such other and further relief to which they may be entitled.

        Respectfully submitted,

/s/ Darren VanPuymbrouck
DARREN M. VANPUYMBROUCK
FREEBORN & PETERS LLP
311 SOUTH WACKER DRIVE
SUITE 3000
CHICAGO, IL 60606
TPN:   (312) 360-6788
FAX:  (312) 360-6520
E-mail: *dvanpuymbrouck@freeborn.com*

/s/ Rebecca C. Brightwell
REBECCA C. BRIGHTWELL
SBN:   24035562
415 S. FIRST STREET, SUITE 430
LUFKIN, TEXAS 75901
TPN:   (936) 639-2550
FAX:   (936) 639-2554
E-mail:  *rcb@brightwelllaw.com*

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of October, 2016, I electronically filed the foregoing using the CM/ECF System which will send notification of such filing to all counsel of record who have registered with this Court's ECF system.

        /s/ Rebecca C. Brightwell
        REBECCA C. BRIGHTWELL